IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGDA L. LACY,                         )
                                       )
            Plaintiff,                 )
                                       )        No. 11 C 1556
v.                                     )
                                       )        Magistrate Judge Schenkier
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Magda L. Lacy, has filed a motion seeking summary reversal and remand of
the final decision by the Commissioner of the Social Security Administration ("the Commissioner")
denying her applications for social security benefits (doc. # 21). The Commissioner has filed a
response asking this Court to affirm the decision denying benefits (doc. # 29). For the reasons set
forth, we grant plaintiff's motion for remand.

## I.

We begin with the procedural history of the case. Ms. Lacy filed for disability insurance
benefits ("DIB") and supplemental security income ("SSI") on May 15, 2007, alleging a disability
onset date of July 3, 2003 (R. 237, 244), due to impairments stemming from back, hand, and
shoulder problems. After her applications were denied initially and upon reconsideration (R. 123-
25), Ms. Lacy requested and received a hearing with an Administrative Law Judge ("ALJ") (R. 155).
On June 24, 2009, Ms. Lacy, Vocational Expert ("VE") Michelle Peters, and Medical Expert ("ME")

---

[1]On May 3, 2011, by consent of the parties (doc. # 13) and in accordance with 28 U.S.C. § 636(c), this matter
was reassigned to this Court for all proceedings, including the entry of final judgment (doc. # 14).

Dr. Ernest Mond testified at the hearing (R. 35). On November 4, 2009, the ALJ issued a decision denying benefits and finding that Ms. Lacy was not disabled under sections 216(I) and 223(d) of the Social Security Act (R. 20-33). The Appeals Council denied Ms. Lacy's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (R. 5). *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

## II.

We now summarize the administrative record. We set forth the general background in Part A. In Part B, we review the medical record of Ms. Lacy's physical ailments, which includes complaints of pain Ms. Lacy made to her physicians, followed by the medical record of Ms. Lacy's alleged mental impairments in Part C. In Part D, we discuss the hearing testimony, and we address the ALJ's written opinion in Part E.

## A.

Ms. Lacy was born on August 10, 1970 (R. 47). She is a single mother with a high school degree (R. 50). At the time of the hearing, she was living in a homeless shelter with her seven-year-old and nine-year-old children (R. 47-49). Her nineteen-year-old son was away at school (R. 49).

In March 2003, Ms. Lacy was involved in a motor vehicle collision (R. 52). At the time of the collision, she was employed as a bank receptionist, but she was laid off because she missed a lot of work due to her injuries (*Id.*). In February 2004, Ms. Lacy slipped on ice and injured her right shoulder (R. 56), and in October 2005, Ms. Lacy injured her right hand when she punched someone (R. 358). She did not work in 2004, and in 2005 and 2006, she was very briefly employed as a cashier, but she quit those positions because it was too painful for her hands, back, legs, and neck (R. 51-52).

**B.**

Following her accidents, Ms. Lacy visited a series of physicians, surgeons, and physical therapists to address pain in her back, right buttocks, neck, right arm, and leg. On March 29, 2004, after reviewing an MRI of Ms. Lacy's back, Dr. Ben Roitberg, a neurosurgeon, diagnosed Ms. Lacy with degenerative disk disease in the L5-S1 disk space, and recommended that Ms. Lacy pursue physical therapy in order to relieve her back pain (R. 429). Dr. Roitberg noted that the MRI was partially consistent with Ms. Lacy's complaints of lower back and neck pain, "but [did] not correlate with [them] completely" (*Id.*).

Later in 2004, Ms. Lacy visited Dr. Mark Nolden, an orthopedic surgeon, to address her complaints of significant low back pain with radiation into the buttocks and thighs (R. 364, 369). She reported that despite four months of physical therapy and an epidural steroid injection, her low back pain continued with radiating pain down her right leg, which pain worsened with prolonged sitting (R. 364). MRI scans showed degenerative disk disease at L5-S1 (*Id.*).

In October 2004, Ms. Lacy was seen by anesthesiologist Antoun Nader (R. 377). Dr. Nader agreed that Ms. Lacy had disk problems at L5-S1 but no lumbar alignment problems, and he recommended epidural steroid injections for pain management (R. 382-83).

In the latter half of 2004, Ms. Lacy also began to complain of right shoulder and arm pain with intermittent swelling, due to falling on her outstretched hand (R. 365). X-rays of the right shoulder were negative and she had excellent motor strength, but she had significant pain upon movement (*Id.*). In October 2005, a doctor recommended Naproxen and ice for contusion and swelling in her right hand after she punched someone (R. 358-60).

3

In February 2006, Ms. Lacy visited Dr. Nolden again. He reported that despite a lumbar stabilization/physical therapy program and lumbar injection, Ms. Lacy reported that her pain continued and now predominated in the right buttock and right leg, with numbness in her first, second, and third toes (R. 353-55). Her left leg pain was intermittent (R. 354). An MRI of her spine from February 2006 showed that the L5-S1 disk protrusion was stable in size and appearance since an August 19, 2004 MRI (R. 553).

Medical records from August and September 2006 indicate that Ms. Lacy's complaints of arm, shoulder, and neck pain continued throughout 2006 (R. 525-30, 558-59). In addition, an October 2006 radiology examination found some mild degenerative changes in her spine (R. 549) and moderate tendinosis in her right shoulder (R. 551).

On March 30, 2007, in response to continuing complaints of pain, orthopedic surgeon Dr. Michael Haak performed a partial diskectomy and partial laminectomy to remove portions of Ms. Lacy's intervertebral disk and vertebral bone around her right L5-S1 herniated disk (R. 594). From June to October 2007, Ms. Lacy's complaints of neck, back, and shoulder pain continued (*see* R. 503, 507, 510-14), and MRIs from June and July 2007 found mild degenerative changes in her back and moderate tendinosis in her shoulder (R. 561-63, 566).

On October 19, 2007, Dr. Rochelle Hawkins conducted a consultative examination of Ms. Lacy for the Department of Disability Services ("DDS") (R. 631). Dr. Hawkins reported that Ms. Lacy had difficulty getting on and off the examining table, and she looked uncomfortable and in pain while sitting on it (R. 632). The range of motion in her neck, shoulders, back, and legs was decreased due to pain (R. 632-33). Ms. Lacy was in so much pain that she cried as Dr. Hawkins examined her (R. 633).

On November 2, 2007, non-examining physician Vidya Madala completed a physical residual

functional capacity ("RFC") assessment of Ms. Lacy (R. 638). Dr. Madala concluded that Ms. Lacy

had the following exertional limitations: she could occasionally lift up to twenty pounds; she

frequently could lift up to ten pounds; she could stand, walk, or sit for six hours in an eight-hour

work day; and she was limited in her ability to push or pull with her upper extremities (R. 639).

Additionally, Dr. Madala opined that Ms. Lacy could occasionally climb stairs, balance, stoop, kneel,

crouch, and crawl, but should never use ladders or scaffolding (R. 640). Further, Ms. Lacy was

limited in her ability to reach in all directions, but had no limitation in handling, fingering, or feeling

(R. 641). Dr. Madala concluded that Ms. Lacy was capable of light work, with the limitations noted

(R. 645).

Ms. Lacy was treated at the Chronic Pain Care Center at the Rehabilitation Institute of

Chicago ("RIC") from December 1, 2007 through June 2008 (R. 856). At her initial visit to RIC on

November 20, 2007, Dr. Lynn Rader diagnosed Ms. Lacy with lumbar degenerative disk disease,

post-laminectomy syndrome, cervical degenerative disk disease, cervicogenic headache, right

shoulder ligament injury, myofascial pain syndrome, obstructive sleep apnea, and right sacroiliac

joint dysfunction (R. 655). Ms. Lacy then completed a four-week comprehensive treatment program

at the Pain Care Center (*Id.*).

At a February 2008 recheck at RIC, Ms. Lacy told Dr. Rader that she was still in constant

pain (R. 666). Ms. Lacy was using a cane, and she had been noncompliant with her home exercise

program (*Id.*). Ms. Lacy told Dr. Rader that she had fallen in front of a therapist, but when Dr. Rader

consulted with the therapist, the therapist said that Ms. Lacy had "essentially feigned falling and was

able to catch herself in a controlled manner" (R. 667). Dr. Rader reported that Ms. Lacy wanted to

5

go on disability and did not want to return to work (R. 666-67). In her report, Dr. Rader wrote that "the patient was counseled on the fact that she completed a four-week program which is essentially a sedentary job, [and] that I do not give out disability" (R. 665).

In June 2008, Dr. Rader stated that despite medication (including Norco, Lyrica, and Zanaflex) and pain management techniques, Ms. Lacy stated that her pain was the same – constant in the right side of her body and neck (R. 857). Ms. Lacy was sleeping well, but not exercising; her pain increased with stress and might decrease slightly with medications and biofeedback (*Id.*). Dr. Rader stated that she did not know what more to offer Ms. Lacy (R. 858).

On May 16, 2008, Dr. David Bitzer affirmed Dr. Madala's physical RFC finding, upon consideration of the new evidence from the RIC's Chronic Pain Center (R. 805-06). Dr. Bitzer reviewed a work assessment that Ms. Lacy completed at RIC that placed her at sedentary work, but he found that she was "basicaaly [*sic*] non-compliant with treatment and could probably perfomred [*sic*] better that [*sic*] she actually did," and thus did not give controlling weight to the work assessment (R. 806). Dr. Bitzer concluded that Ms. Lacy was "not fully credible" and appeared to "be exaggerating her symptoms" (*Id.*).

In August and September 2008, Ms. Lacy continued to complain about neck, back, and right side pain at her visits to her family medicine clinic (R. 903-10). In September 2008, Ms. Lacy had whole body imaging done, which showed increased activity in the upper thoracic spine, which could be related to degenerative changes, but no other abnormal activity (R. 891-92). In February 2009, Ms. Lacy had another CT scan of her head and neck, the results of which were unremarkable (R. 928).

## C.

Ms. Lacy's depressive symptoms were first reported after the onset of her pain issues. Ms. Lacy began seeing social worker Lamont Taylor, MSW, LCSW, in August 2007. Mr. Taylor found that she had moderate to severe depressive symptoms, and appeared gloomy and miserable (R. 652). In November 2007, psychologist Dr. Christine Gagnon noted Ms. Lacy's depressed mood and pain-related anxiety, and opined that Ms. Lacy's depression and lack of energy may have decreased her activities and contributed to her increased pain (R. 656-57). Ms. Lacy began taking Zoloft (R. 503). The next month, in a December 7, 2007 report, Mr. Taylor opined that Ms. Lacy had been "suffering from long-standing depressive symptoms left untreated for more than two years" (R. 653).

On June 16, 2008, psychiatrist Ana A. Gil completed a consultative medical examination of Ms. Lacy for DDS (R. 799). Ms. Lacy was tearful throughout the interview (*Id.*). Ms. Lacy reported having chronic feelings of hopelessness, helplessness, worthlessness, and anhedonia, but she had never been treated by a psychiatrist (R. 800). She reported difficulty with concentration and memory, but her recent and remote memory appeared intact upon examination (R. 800, 802). Ms. Lacy is socially isolated because her friends do not want to be burdened with her (R. 800-01). Dr. Gil concluded that Ms. Lacy suffered from major depression, moderate in severity, without psychotic features (R. 803).

On June 30, 2008, psychologist Thomas Low, Ph.D., completed a Psychiatric Review Technique for Ms. Lacy considering Listing 12.04, affective disorders (R. 807). Dr. Low found that Ms. Lacy had moderate restrictions in activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (R. 817). While Dr. Low found that

7

Ms. Lacy had some moderate limitations in understanding and memory, concentration and persistence, and social interaction, he found no marked limitations (R. 821-22). Dr. Low concluded that Ms. Lacy could not do complex tasks or assignments due to her depressive symptoms of loss of concentration and sad mood, but she could complete simple tasks and follow simple directions and thus remained able to work (R. 823).

Mr. Taylor's report of April 2009 aligned with his earlier impressions of Ms. Lacy's mental state (R. 893-94).[2] He opined that Ms. Lacy experiences recurrent major depressive episodes, with symptoms of hyposomnia, overeating, low energy, low self-esteem, poor concentration, and thoughts of hopelessness (R. 894). Mr. Taylor found marked restriction in ADLs; moderate difficulties in maintaining social functioning; and marked deficiencies in concentration, persistence, or pace. Mr. Taylor also opined that Ms. Lacy would miss more than three days of work per month due to her impairments and would need to take more than three unscheduled breaks during the work day (895-96). He opined that Ms. Lacy's impairments have lasted or are expected to last at least 12 months (R. 896).

## D.

At the administrative hearing before the ALJ, Ms. Lacy testified to having several impairments. She has trouble sleeping due to anxiety and pain, and though she gets six to seven hours of sleep, she wakes up fatigued due to sleep apnea (R. 53-54, 68). Ms. Lacy tends to her personal hygiene, but she has difficulty getting her right arm over her head so her children help her dress and tie her shoes (R. 54, 66). Her children also help her do laundry and shop for food twice

---

[2] Despite his earlier report from December 2007, Mr. Taylor erroneously wrote in this latter report that he treated Ms. Lacy from June 2008 to April 2009 (R. 893).

a week (R. 54-55, 67, 70). She can carry grocery bags and a gallon of milk with her left hand (R. 55, 67).

Ms. Lacy testified that she can walk about half a block and takes stairs slowly because she must stop and rest due to tightening in her lower back and shooting, burning, and throbbing pain in her right leg (R. 55-57). She testified that her pain has worsened since her surgery; the whole right side of her body is very tender and sore, and she has aching, sharp, and burning pain every day (R. 57). Ms. Lacy stated that repetitive movements and sitting for more than twenty minutes aggravates her arm and back pain (R. 59, 70). Ms. Lacy complained of arm pain at the hearing, stating that it prevented her from raising her right arm above her chest (R. 51, 69). She testified that epidural shots did not help her pain (R. 59). She also takes Tizanidine, Tylenol 3, and Aleve for pain, but her medications make her drowsy, light-headed, and a little woozy (R. 61-62).

Ms. Lacy also takes medicines for her mental impairments: Abilify and Cymbalta (R. 61-62). She testified that anti-depressants have helped her; she has not had suicidal thoughts in a while (R. 71-72). She still has low energy and difficulty concentrating (she can only focus for ten minutes before drifting off while reading), and she still gets very sad and feels blank (R. 66, 72). Ms. Lacy also has memory problems; she forgets where she puts her phone and keys (R. 72-73).

The medical expert ("ME"), Dr. Ernest Monde, testified next. He noted that he was "torn about this case" (R. 74). In response to his questions, Ms. Lacy explained that she saw several different doctors and neurosurgeons, because some doctors said no surgery and she "had a lot of pain," including "extreme pain" in her right leg and lower back, and she "wanted relief" (R. 74-75).

The ME analyzed Ms. Lacy's physical problems as of June 2008 as follows:

> She's not doing the exercise. So this is a very complicated orthopedic problem, with continuing complaints about pains not responding to multiple modalities: physical therapy, epidural, steroid injections, surgery, after two surgeons have said they don't want to do it and one, Dr. Haag at Northwestern, does it. She's taken care of by competent doctors, and they really don't have answers or elucidate this problem. The pain is subjective, the findings of the cervical MRI, the lumbar, and the back are relatively minor. The EMG [electromyography] is always normal.

(R. 81). There was some discrepancy between Ms. Lacy's physical performance at examinations by different doctors: the ME testified that exams revealing decreased range of motion had to be weighed against those finding no decreased range, and he considered that "range of motion can be influenced subjectively" (R. 87-88). The ME relied heavily on the opinions of Dr. Rader, a "sophisticated physician" at RIC, who as late as February 29, 2008, found Ms. Lacy had good range of motion and muscle strength (R. 87), and who, according to the ME, provided "the only really careful, detailed examination in this whole record" in November 2007 (R. 95).

The ME stated that "there are no findings to suggest radiculopathy . . . EMG is normal, neurological examination [is normal]" (R. 85). The ME noted that Ms. Lacy had been non-compliant with Dr. Rader's prescribed exercises and medications and that she had feigned a fall (R. 79–80). While he conceded that it was possible someone with Ms. Lacy's medical history could still have significant pain (R. 92), the ME noted that her surgeon had opined that Ms. Lacy's symptoms "should have disappeared" following the diskectomy (R. 85).

The ME stated that he had difficulty assessing Ms. Lacy's situation because he was not an orthopedist (R. 81). Nevertheless, he opined that Ms. Lacy does not meet or equal a listing, and that she "can occasionally lift 20 pounds, frequently ten; stand and walk at least two hours in a work day" with a sit/stand option (R. 81-82). The ME relied on his "personal experience" to determine these

limitations (R. 91). He did not find Ms. Lacy's "mild obesity" to be relevant to the RFC because nobody mentioned it in the file (R. 96).

The VE, Michelle Peters, testified next. The ALJ questioned the VE based on a hypothetical individual who could: sit six out of eight hours per day and stand or walk two with a stand/sit option at will; lift ten pounds frequently and twenty pounds occasionally; occasionally bend, squat, crawl, climb, and use a cane; and avoid ladders, ropes, scaffolds, moving machinery, marked changes in temperature, commercial driving, and reaching above shoulder level with the right arm (R. 99-102). The hypothetical individual was also moderately limited in the ability to understand, remember, and carry out detailed instructions; to perform activities within a schedule; and to maintain regular and punctual attendance (*Id.*). Lastly, the hypothetical individual was mildly limited in the ability to deal with supervisors, coworkers, and the general public (R. 101).

The VE testified that these limitations allow a limited range of light or sedentary manufacturing work, with a sit/stand option (R. 103-04). The VE was concerned, however, that the hypothetical individual may have to be off task more than 18 percent of the work day, which would eliminate substantial gainful activity (R. 104-05). If someone needed to take three unscheduled 15 to 30 minute breaks during the work day they would not be able to sustain competitive employment (R. 108).

At a sedentary level of work, the VE opined that there would be unskilled hand packaging, assembly, and inspection types of positions available, about 800 of each (R. 106-07). At a light level of work, the VE opined that there would be approximately 950 sorting types of positions, 1,000 hand packaging types of positions, and 1,000 assembly types of positions (R. 105). The VE explained that these numbers were reduced from the total number of jobs listed in the Dictionary of Occupational

11

Titles ("DOT"): 2,100 unskilled, sedentary assembly jobs; 2,050 unskilled, sedentary hand packaging jobs; and 1,100 unskilled, sedentary inspection jobs (R. 109-10). The VE reduced the DOT numbers based on her own education and experience performing direct job placement services and labor market surveys (R. 110-11). The ALJ stated: "I don't think I would consider the light positions, but the sedentary positions I would consider" (R. 107).

The VE testified that she has reports and statistics to support her number reduction which are available if needed by the ALJ (R. 111). Ms. Lacy's attorney stated that she would like to see the statistics, reports, and research the VE relied on for determining the reduced number of jobs available (R. 112). Her attorney specified that she would like to see "[s]tatistics saying that somebody with all the limitations that [the ALJ] gave, sit/stand option, would be employable" in the jobs the VE specified (R. 114). The ALJ and the VE stated that statistics for an individual with the same unique limitations as Ms. Lacy does not exist (R. 112-14).

Before concluding the hearing, the ALJ stated that he would send Ms. Lacy for a psychiatric evaluation, but not for an orthopedic evaluation, because the ALJ believed that the ME's testimony was sufficient as to Ms. Lacy's physical limitations, despite the ME not being an orthopedic specialist (R. 120-21).

## E.

In his November 4, 2009 opinion, the ALJ found that Ms. Lacy was not disabled at any time between the alleged onset date of July 3, 2003 and the date of the decision (R. 33). At Step 1, the ALJ found that Ms. Lacy has not engaged in substantial gainful activity since the alleged onset date (R. 22). At Step 2, the ALJ found that Ms. Lacy suffered from four severe, medically determinable

impairments: major depression, single episode without psychotic features; chronic pain; post-surgery status; and impairment of the right upper extremity (R. 23-24).

At Step 3, the ALJ concluded that none of Ms. Lacy's impairments met or medically equaled a Listing. With respect to Listings 1.02 (major dysfunction of the joints) and 1.04 (disorders of the spine), the ALJ recited the impairments and symptoms enumerated in those Listings and concluded that the record did not support finding that Ms. Lacy's alleged impairments included any of those specified in Listings 1.02 and 1.04 (such as nerve root compression, limitation of motion of the spine, motor and sensory loss, gross anatomical deformity, chronic joint pain and stiffness, and inability to ambulate effectively).

In determining that Ms. Lacy's physical impairments did not meet or equal a Listing, the ALJ relied on Dr. Hawkins' consultative report as to Ms. Lacy's physical limitations. The ALJ reviewed Dr. Hawkins' examination of Ms. Lacy: tender to the touch on right shoulder, good grip strength, normal fine and gross manipulation in both hands, full range of motion in all other joints, minimal tenderness in upper back, tenderness in lower back, spasm on right side, decreased flexion and extension side bending, decreased straight leg raising, no impairment in left upper extremity, and slow gait (with no ambulatory aid) (R. 23, 27). Dr. Hawkins had also noted Ms. Lacy's report of constant pain in her neck, back, and shoulders, at a level of eight or nine out of ten (R. 27). Dr. Hawkins diagnosed Ms. Lacy with severe back pain, status post right shoulder surgery, severe pain, and status post fall (*Id.*).

The ALJ also reviewed the MRIs done of Ms. Lacy's back in 2004 and 2006 and treatment notes from RIC from November 2007 through February 2008. The ALJ gave "considerable weight" to the opinion of Dr. Rader from RIC's Chronic Pain Care Center (R. 25-26, 31). The ALJ noted

13

that in a progress report after a four-week pain management program, Dr. Rader indicated that Ms. Lacy's complaints of pain were the "same," but her activity tolerance and function was "better" and Ms. Lacy's overall progress and compliance were "fair" (R. 26). The report also indicated that Ms. Lacy was concerned with being deemed "disabled" and was unwilling to return to work (*Id.*). On June 5, 2008, Dr. Rader stated that she did not know what more to offer Ms. Lacy (R. 29).

The ALJ gave "great weight" to the testimony of Dr. Mond, the ME at the administrative hearing (R. 28, 31). Dr. Mond found that Ms. Lacy does not meet or equal any listings because this was not a surgical case: the diskectomy could have helped with her leg pain but not her back pain (R. 29). Also, various physical examinations showed that Ms. Lacy was not in distress and had normal extremity strength and gait (*Id.*). Further, the EMGs were normal, and the MRIs showed only mild changes (*Id.*). Ms. Lacy had complex continuing pain, but surgery should have erased nerve root compression (R. 30). In addition, there was no evidence of radiculopathy (*Id.*). And, Ms. Lacy was taken care of by competent doctors, but did not follow their prescribed exercises (*Id.*).

The ALJ also found that Ms. Lacy's alleged mental impairments did not meet Listing 12.04 (R. 24-25). The ALJ concluded that Ms. Lacy's mental impairment appeared to be secondary to her physical impairments (R. 30). While RIC's psychological assessment of her indicated depressed mood and pain-related anxiety, the ALJ noted that she had a chronic pain problem, not syndrome, and her sleep problems were related to pain, not depression (*Id.*).

The ALJ "accept[ed]" Dr. Low's mental RFC assessment: that Ms. Lacy had no more than moderate limitations in the ability to understand and remember detailed instructions, no significant limitations in the ability to understand and remember very short and simple instructions, and no more than moderate limitations in the ability to maintain attention and concentration for extended periods

14

(R. 31). Dr. Low also opined that Ms. Lacy had moderate restrictions in ADLs (R. 23). The ALJ

agreed, because Ms. Lacy can groom herself and cook with the help of her children (R. 24). The ALJ

also agreed with Dr. Low's opinion that Ms. Lacy had moderate difficulties in maintaining social

functioning, because she plays board games with her children, uses public transportation, calls

friends and family, and gets along with authority figures (*Id.*). The ALJ further agreed that Ms. Lacy

had moderate difficulties in maintaining concentration, persistence, or pace, and the ALJ pointed out

that Dr. Neufeld found that Ms. Lacy's remote and immediate memory were good (R. 25). Dr. Low

noted, however, that Ms. Lacy cannot "perform complex tasks and assignments due [to] depressive

symptoms" (R. 24).

The ALJ also noted Dr. Gil's consultative assessment from June 16, 2008, which diagnosed

Ms. Lacy with moderate major depression without psychotic features (R. 26). Dr. Gil stated that Ms.

Lacy has trouble concentrating and mild psychomotor agitation, but her memory was good (*Id.*). Ms.

Lacy was tearful and sad throughout the interview (*Id.*).

The ALJ declined to give controlling weight to the opinion of Ms. Lacy's treating social

worker, Mr. Taylor, that Ms. Lacy's mental impairments met or equaled a Listing (R. 31). The ALJ

found that Mr. Taylor's opinions that Ms. Lacy had sleep disturbance, decreased energy, and

difficulty concentrating or thinking due to mental impairments (as opposed to pain) were inconsistent

with other reports and findings in the record: specifically, her ability to complete many ADLs, such

as preparing kids for school, stretching, doing paperwork, reading, and helping with homework,

laundry and dishes (*Id.*). In addition, the ALJ gave "little weight" to Mr. Taylor's opinion on the

Paragraph B criteria: that Ms. Lacy had marked restrictions in ADLs and concentration, persistence,

or pace; and would be absent from work more than three days each month (R. 24). The ALJ

explained that while Mr. Taylor's reports of Ms. Lacy's signs and symptoms may be accurate, Mr. Taylor's opinion on the limitations in the Paragraph B criteria "have serious vocational implications," and Mr. Taylor was not qualified to render such opinions on the extent to which Ms. Lacy's impairments would prevent her from working (*Id.*). In addition, the ALJ found that Mr. Taylor's Paragraph B findings were inconsistent with the opinions of the state agency medical consultants, Drs. Low and Gil (R. 31).

> The ALJ determined that Ms. Lacy has the RFC to:
>
> lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for two hours and sit fore [*sic*] six hours in an eight hour workday, but she needs a sit/stand option; use her hands for repetitive action such as simple grasping and fine manipulations; occasionally engage in bending, squatting, crawling, and climbing but must never climb or work with ladders, ropes and scaffolds; must never reach over shoulder level with the right upper extremity; must not work at unprotected heights, around moving machinery, driving automotive equipment, exposure to marked changes in temperature and humidity. She has the nonexertional limitations of performing work involving no more than simple instructions and task [*sic*], and must not have more than moderate interaction with the general public.

(R. 27). In making this finding, the ALJ reasoned that Ms. Lacy's complaints "are out of line with the underlying disability. She has some credibility, but not where the credibility is inconsistent with the [RFC] shown above" (R. 28). The ALJ contrasted Ms. Lacy's complaints of pain with Dr. Hawkins' findings and Ms. Lacy's ADLs report, which stated that she gets her kids ready for school, cooks, takes care of business, helps her kids with homework, showers, assists with the laundry and dishes, can walk half a block without resting, drives a car, uses public transportation, goes to the store and shops for food, goes to her kids' school on a regular basis, and socializes with other ladies (*Id.*).

In addition, while Ms. Lacy told Dr. Hawkins on October 19, 2007, that her pain was at an eight or nine out of ten every day, on February 29, 2008, she reported to RIC that her pain was at a four out of ten (R. 29). Nevertheless, on that same day, Ms. Lacy was using a cane, which she had not used previously, but Ms. Lacy was able to take her shoes off and climb on the examination table (*Id.*). Also, Dr. Rader noted that Ms. Lacy's therapist believed she had feigned falling (*Id.*).

The ALJ elaborated on other physician reports which he believed showed inconsistencies between Ms. Lacy's complaints of constant pain and examinations results – which sometimes evidenced limited range of motion and tenderness, but sometimes did not (R. 29-30). The ALJ was suspicious of the fact that an MRI showed that surgery had alleviated Ms. Lacy's nerve root compression,[3] but "inexplicably, the symptoms did not disappear, but there are no findings to suggest radiculopathy" (R. 30). The ALJ also stressed Ms. Lacy's concern that she be "deemed 'disabled'" because she did not want to return to work (R. 30-31).

At Step 4, the ALJ concluded that Ms. Lacy could not perform her past relevant work as a receptionist, defined as semi-skilled work (R. 31-32). At Step 5, the ALJ determined that Ms. Lacy could perform sedentary and light work subject to the limitations in the RFC. The ALJ relied on the VE's testimony that for an individual with the additional limitations in Ms. Lacy's RFC, a significant number of jobs exist in the regional economy: 850 hand packager jobs, 800 assembler jobs, and 800 inspector jobs (R. 32-33).[4] The ALJ stated that the VE's testimony was consistent with the DOT (R. 32). Thus, the ALJ concluded that Ms. Lacy was not disabled (R. 33).

---

[3]The ALJ erroneously referred to the nerve root compression as having been "obviated by surgery" (R. 30).

[4]Though neither party addresses this, the ALJ misstated the VE's testimony here. At the hearing, the VE used these numbers to indicate the number of sedentary jobs available. As noted above, at the light level of work, the VE opined that there would be approximately 950 sorting types of positions, 1,000 hand packaging types of positions, and 1,000 assembly types of positions (R. 105).

17

# III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

The social security regulations outline a five-step sequential evaluation process for determining whether a claimant has a disability. These steps require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant carries the burden of proof in Steps 1 through 4; the Commissioner carries the burden in Step 5.

Judicial review of an ALJ's decision is deferential: we uphold an ALJ's decision if it is supported by "substantial evidence," defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). In rendering his decision, the ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal citations omitted). Nevertheless, the ALJ must consider all relevant evidence, not only the

evidence that favors his ultimate conclusion, and he must articulate the reasons he rejected certain evidence. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (internal citations omitted).

## IV.

Plaintiff alleges that the ALJ committed several errors that warrant remand. We focus our discussion here on plaintiff's first argument, that the ALJ failed to inquire sufficiently into the reliability of the VE's testimony about the number of available jobs a person with Ms. Lacy's RFC could perform. We agree that this argument has sufficient merit to require a remand.

## A.

During the hearing, the VE testified that someone with plaintiff's RFC could perform hand packaging, assembly, and inspection jobs at the sedentary level of work; and sorting, hand packaging, and assembly jobs at the light level of work (R. 105-06). The VE testified that approximately 2,450 such sedentary jobs exist (850 hand packaging jobs, 800 assembly jobs, and 800 inspection jobs) and approximately 2,950 light jobs exist (950 sorting jobs, 1,000 hand packaging jobs, and 1,000 assembly jobs) (*Id.*). The ALJ relied on the VE's testimony as to the sedentary jobs available in concluding, at Step 5, that there exists a significant number of light and sedentary jobs in the regional economy that Ms. Lacy could perform given her RFC (R. 32-33).

Under questioning by Ms. Lacy's attorney, the VE testified that according to the Department of Labor statistics, there are in fact a greater number of hand packaging, assembly and inspection jobs than she had enumerated: specifically, 2,050 total hand packaging jobs, 2,100 total assembly jobs, and 1,100 total inspection jobs (R. 110). The VE explained that she had made an "educated guess," relying on her experience performing direct job placement services and labor market surveys, to reduce those "base numbers" to address Ms. Lacy's limitations (R. 110-11). The VE testified that

19

she had 14 and one-half years of experience doing job placement, which includes providing vocational opinions on an individual's functional abilities, developing an appropriate vocational plan, and searching the job market for jobs an individual can perform (R. 115). The VE's caseload ranges from a low of five to a high of forty (R. 115-16). The VE testified that she has reports and statistics from her job placement services and labor market surveys available for review if needed by the ALJ (R. 111).

Plaintiff's attorney asked to see the "source" of the VE's reduced numbers (R. 112). The ALJ asked for clarification of that request, and plaintiff's attorney specified that she wanted to see the VE's statistics and reports – even a "scientific analysis" – in order to "see how the number reduced" (*Id.*). The ALJ responded that "scientific verification" of the VE's analysis does not exist: "there's not going to be a statistical report that tells you how she reduced the number" (*Id.*). The VE and the ALJ explained that job analyses and statistics of placing people into the relevant positions exist, but statistics based on placing people with Ms. Lacy's specific set of restrictions do not exist (R. 112-13).

Plaintiff's attorney explained that she has "gone through this before" with the VE, and "if there's nothing for [plaintiff's attorney] to see, then that's fine," but as Ms. Lacy's attorney, she still has "to preserve it for the record" as to whether the VE's opinion is "based on experience and nothing scientific" (R. 113-14). Plaintiff's attorney defined scientific as: "statistics saying that somebody with all the limitations that you gave, sit/stand option, would be employable," as the VE testified (R. 114).

The ALJ reiterated that such an analysis was "impossible," unless Ms. Lacy's attorney found somebody with exactly the same limitations as Ms. Lacy (R. 114). Ms. Lacy's attorney agreed that "this problem has not been solved by Social Security," and she explained that was why – even with the VE's extensive experience ("which is sort of a subjective thing") – she was still "questioning the reliability of how reduction of numbers comes about," because "there's nothing to substantiate the numbers, other than just any given vocational expert coming in and saying that there's this many jobs" (R. 114, 116-17). Ms. Lacy's attorney thus sought "some sort of statistical research report so we can verify that those numbers are actually correct, either by she's going in and keeping stats on these people that she's been referred, based on their medical limitations" (R. 116).

The ALJ concluded that he did not see how the VE could get closer to an accurate number for a specific hypothetical individual, and Ms. Lacy's attorney conceded that she did not know either (R. 117). The ALJ noted that "it is significant that the numbers have been reduced" (*Id.*). Nevertheless, Ms. Lacy's attorney stated that "until the courts solve the problems, or the administration does . . . it's nothing against [the VE]," but the attorney "ha[s] to get it on the record" (*Id.*). Ms. Lacy's attorney explained that she does not "know what the answer is. . . . [T]he answer may be that what they're doing is correct. But the courts haven't come down on that, yet. And the administration hasn't . . . given any rules or regulations regarding that, other than they take administrative notice of the DOT. So . . . it's a problem. I do it to preserve the record" (R. 118).

The ALJ agreed that this was a problem, especially because, as the VE pointed out, the DOT is "significantly outdated;" it was last revised in 1991 (R. 118). The VE opined that there were not any better tools to help her do a more precise analysis of the numbers (R. 118-19).

The extended back and forth between the ALJ, plaintiff's counsel, and the VE shows the complexity of the Step 5 analysis when a plaintiff's RFC does not fit squarely within the labels of work capability set forth in the DOT, such as "sedentary" or "light." The VE's approach to addressing that complexity was to opine that there are jobs defined under the DOT as sedentary and light that Ms. Lacy could perform given her RFC – but not as many as the Department of Labor statistics show are available. Given Ms. Lacy's limitations, the VE used her experience to reduce significantly the number of hand packaging jobs (from 2,050 to 1,000) and assembly jobs (from 2,100 to 1,000) Ms. Lacy could perform at the light level of work.[5] The VE then further reduced the number of jobs available at the sedentary level of work: 850 hand packaging jobs, 800 assembly jobs, and 800 inspection jobs (from a total of 1,100). While both the ALJ and plaintiff's counsel lamented the lack of judicial guidance on the Step 5 question when a plaintiff's RFC does not fit neatly within the definitions set forth in the DOT (R. 117-19), we conclude that the case law shows that the ALJ should have done more in an effort to vet the VE's reduction.

"A vocational expert is free to give a bottom line, but the data and reasoning underlying that bottom line must be available on demand if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) (internal quotations omitted). Moreover, "[i]f the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Id.*

---

[5]The VE also opined that 950 sorting jobs would be available to an individual with Ms. Lacy's limitations, but the VE did not testify to the total number of sorting jobs available in the regional economy.

Here, Ms. Lacy's attorney clearly challenged the foundation and reliability of the VE's opinion reducing the number of jobs available in the regional economy. In response, the ALJ inquired into the reliability of the VE's testimony by questioning the VE generally about her job experience (R. 115). For the following reasons, the ALJ erred by not delving deeper.

*First*, the ALJ's attempt to "make an inquiry . . . to find out whether the purported expert's conclusions are reliable" fell short. *See McKinnie*, 368 F.3d at 911. The ALJ's questioning elicited information to which plaintiff's attorney had already stipulated: the general qualifications needed to serve as a vocational expert (R. 98). While personal experience may form part of the basis for a VE's "bottom line," merely revealing how long a VE has been employed does not show "whether the purported expert's conclusions are reliable" on the specific issue challenged by the claimant. *Id.* The VE's testimony about her experience shed no light on how that experience gave her the ability to say, for example, that Ms. Lacy could perform about 41.5 percent of the hand packaging jobs available in the economy (850 out of 2,050), but about 73 percent of the inspection jobs (800 out of 1,100). The VE's testimony did not provide the ALJ, or this Court on review, the information to determine whether the VE's reductions – which the VE candidly described as an "educated guess" – were reliable, and why the VE applied such substantially different reductions to the different positions.

*Second*, the ALJ erred by failing to make the data and reasoning underlying the VE's bottom line estimates available to Ms. Lacy's attorney. *McKinnie*, 368 F.3d at 911. The Seventh Circuit has never clarified *McKinnie*'s requirements concerning precisely what a VE must provide when a plaintiff's attorney challenges his or her testimony. However, we endorse the suggestion in *Smith v. Astrue*, 09 C 2392, 2010 WL 3526655, at *17 (N.D. Ill. Sept. 1, 2010), that an ALJ might satisfy

23

*McKinnie*'s requirements by eliciting "specific data on the number of job candidates [the VE] had handled similar to the plaintiff, the number of jobs available to such candidates, or the reasons supporting the VE's belief that the job market continued to provide jobs to [workers with the plaintiff's restrictions]." Furthermore, *Smith* required that a VE "provide some specificity concerning the facts, figures, or other data that form the basis of his testimony" instead of simply providing a "vague reference to his own experience." *Id.*

Here, plaintiff's attorney asked to see the "source" of the VE's reduced numbers, specifically, the VE's statistics and reports "saying that somebody with all the limitations that you gave, sit/stand option, would be employable" (R. 112, 114). The VE testified that she has reports and statistics from her job placement services and labor market surveys available for review if needed by the court (R. 111), but she does not have statistics based on placing people with the same unique limitations as Ms. Lacy (R. 112-14). However, the absence of another person with Ms. Lacy's specific combination of impairments and limitations should not have been the end of the inquiry. For example, further inquiry into the VE's experience in placing persons with similar (even if not identical) limitations into jobs of these types might shed light on how the VE went about reducing the number of jobs Ms. Lacy could perform from the "base numbers" in the Department of Labor statistics.

That further inquiry did not occur here. As a result, on the state of this record, we have no way of judging whether the VE's reduction hit the mark, or instead substantially undershot or overshot the mark. We do not question whether the VE could have relied on her own experience to reach her conclusions; indeed, even with a VE's case reports and job placement statistics, we expect that final reductions of the Department of Labor numbers may at times still depend to a degree on

24

judgments based on a VE's experience, given the myriad combinations of limitations in a particular claimant's RFC. Rather, we find that the ALJ erred by failing to elicit more detailed information about the VE's experience to enable us (and the ALJ in the first instance) to better determine whether the VE's reductions are a reliable foundation for the ALJ's determination that Ms. Lacy is not disabled.

The ALJ (no doubt unintentionally) hampered the plaintiff's attorney's efforts to acquire documents that might have shed at least some additional light on the foundation for the VE's testimony. Generally, when a plaintiff's attorney challenges a VE's reduction of DOT numbers, she requests documents supporting that reduction. *See, e.g., McKinnie*, 368 F.3d at 911; *Britton v. Astrue*, 521 F.3d 799, 804 (7th Cir. 2008). The ALJ's response here was not to facilitate that request, but to essentially deny that any documents the VE might possess contained the kind of information that plaintiff's attorney was looking for (R. 112). That response needlessly complicated the issue by interfering with, instead of advancing, plaintiff's attorney's efforts to obtain "the data and reasoning underlying [the VE's] bottom line." *McKinnie,* 368 F.3d at 911.

That said, we note that Ms. Lacy's attorney contributed to the unsatisfactory handling of this point by sending some mixed messages. She both asked for information, and at the same time explained that she was requesting the information to "preserve [the issue] for the record" (*see* R. 113-14, 117-18). Indeed, plaintiff's attorney stated that "if there's nothing for [her] to see, then that's fine" (R. 113-14), suggesting she was more interested in preserving the issue than in getting the information.

Both plaintiff's attorney and the ALJ wished for more judicial or administrative guidance (R. 117-18). On remand, we expect that this opinion – along with *McKinnie* and *Smith* – will provide sufficient guidance to allow the ALJ to flesh out the VE's opinion so that he will have a better basis on which to assess the reliability of any reductions the VE makes.[6]

**B.**

While we agree that a remand is necessary due to the error at Step 5, we are less impressed with plaintiff's argument that the ALJ committed additional errors requiring remand. We write briefly to provide guidance on those issues on remand.

*First*, Ms. Lacy contends that the ALJ erroneously omitted her depression and moderate limitations in concentration, persistence, and pace from the RFC (Pl.'s Mem. at 6–8). We disagree. The ALJ's explanation of how he arrived at the RFC references Ms. Lacy's moderate difficulties with concentration, persistence, or pace, and the ALJ limited Ms. Lacy's RFC to performing simple instructions and tasks (R. 27). We reject plaintiff's contention that a limitation to performing simple work cannot adequately account for moderate limitations in concentration, persistence, and pace (Pl.'s Mem. at 7). In addition, the ALJ relied on Dr. Low's mental RFC, which concluded that Ms. Lacy could perform simple tasks and follow simple directions despite her depression. Thus, we find no error in the ALJ's handling of Mr. Lacy's depression, or limitations on concentration, persistence, and pace, in fashioning the RFC.

---

[6]To the extent that plaintiff makes the categorical argument that a VE's experience can *never* satisfy the requirements of *McKinnie* (Pl.'s Mem. at 6), we reject that argument. While plaintiff cites *Smith* to support that contention, we disagree that either *Smith* or *McKinnie* compels that conclusion. *McKinnie* requires no more than that a VE provide on demand any "data and reasoning underlying . . . bottom line [estimates]." *McKinnie*, 368 F.3d at 911. There would be little purpose in having VEs testify at Social Security hearings if their experience could not be relied upon under any circumstances. As explained above, a purely objective methodology for reducing the job numbers may not be possible, given the myriad combinations of limitations in a particular claimant's RFC.

*Second*, Ms. Lacy argues that the ALJ did not account for Mr. Taylor's testimony that she met the Paragraph B criteria (Pl.'s Mem. at 8). However, as we have explained above, the ALJ explained in detail why he did not give Mr. Taylor's opinion on the Paragraph B criteria controlling weight, including that Mr. Taylor's opinions were inconsistent with other medical evidence in the record, and Mr. Taylor was unfamiliar with the vocational implications of the Paragraph B criteria (R. 24, 31). We find that there was substantial evidence to support the ALJ's conclusion.

*Third*, plaintiff argues that the ALJ failed to address evidence of radiculopathy (disorder of the spinal nerve roots) and her inability to perform fine grasping and manipulation (Pl.'s Mem. at 10-12). Again, we disagree. The ALJ's opinion is thorough: it goes through evidence both supporting and contrary to the RFC. "[T]he ALJ need not discuss every piece of evidence in the record," so long as he does not "ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Here, the ALJ addressed Ms. Lacy's reports of hand pain and compared them to medical evidence showing that she had adequate hand strength that allowed her to do some cooking and driving, which the ALJ found indicated she could perform simple grasping and fine manipulations (R. 27, 30). He was not required to specifically address each of Ms. Lacy's reports of hand pain and weakness in the record. As for the evidence of radiculopathy, Ms. Lacy cites to medical records preceding her March 2007 partial diskectomy and laminectomy. The ALJ acknowledged that Ms. Lacy had radiating pain prior to the surgery (R. 29), but we find that he committed no error in finding that the record does not suggest post-surgical radiculopathy (Pl.'s Mem. at 12).

*Fourth*, Ms. Lacy contends that the ALJ improperly determined her credibility. In making this argument, plaintiff seizes upon the ALJ's statement that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above [RFC]" (R. 30). The Seventh Circuit has repeatedly denounced this formulation as unhelpful "boilerplate" that suggests that the credibility determination was shaped to fit into a pre-determined RFC analysis. *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir. 2010). Nonetheless, the use of this formulation does not warrant remand unless it is unaccompanied by supporting reasoning. *See Carter v. Astrue*, 413 F. App'x 89__, 905-06 (7th Cir. 2011); *see also Sombright v. Astrue*, No. 10 C 2924, 2011 WL 1337103, at *14 (N.D. Ill. Apr. 6, 2011). As in *Sombright*, the ALJ here "did not stop with that conclusory statement." *Id.* Instead, the ALJ gave a detailed summary of Ms. Lacy's medical history, including examinations in which her pain and range of motion were manageable. The ALJ also noted that Ms. Lacy had apparently feigned falling in front of a physical therapist (R. 30); that she did not always follow prescribed treatment (*Id.*); and that Dr. Rader had opined that Ms. Lacy seemed primarily concerned with being found disabled (R. 31). Contrary to plaintiff's argument (Pl.'s Reply at 6), the ALJ did not place undue emphasis on Ms. Lacy's ability to perform simple daily tasks – he did not equate housework with work in the labor market, but properly used that evidence to assess Ms. Lacy's restrictions in activities of daily living. The ALJ's discussion explains, and provides substantial evidence to support, his credibility determination.

## CONCLUSION

For the reasons above, we grant Ms. Lacy's motion to remand (doc. #21) and deny defendant's motion to affirm (doc. #29). The case is remanded for further proceedings consistent with the Memorandum Opinion and Order. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: October 4, 2012**